**CV 15        3872**

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

FILED
CLERK

2015 JUL -2  AM 10: 14

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

---

Myers Equipment Corporation, on behalf of itself
and all others similarly situated

                Plaintiff,

       v.

Espar Inc., Espar Products Inc., Webasto Products
North America, Inc., and Webasto Thermo &
Comfort North America, Inc.

                Defendants.

**COMPLAINT**

GLEESON, J.
ORENSTEIN, M.J.

**JURY TRIAL DEMANDED**

---

1.      Plaintiff Myers Equipment Corporation ("Plaintiff"), on behalf of itself and all

others similarly situated, by their counsel, assert claims for violations of federal antitrust law

against Espar Inc., Espar Products Inc., Webasto Products North America, Inc., and Webasto

Thermo & Comfort North America, Inc. ("Defendants"), as well as Defendants' unnamed co-

conspirators, arising from a conspiracy to fix prices for parking heaters (including the heaters

themselves, accessories sold for use with heaters and packaged kits containing heaters and

selected accessories) sold in the aftermarket for use in commercial vehicles from on or before

October 1, 2007 through at least December 31, 2012 (the "Class Period").

2.      Plaintiff's claims are made on information and belief except as to allegations

specifically pertaining to Plaintiff and its counsel, which are made on personal knowledge.

## NATURE OF THE ACTION

3.      This case arises from a conspiracy to fix prices for air parking heaters (that work by heating interior or outside air drawn into the heating unit) and water (or "coolant") parking heaters (that are integrated into the engine coolant circuit and heat the engine as well as the interior compartment) sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories (collectively "Parking Heaters", unless otherwise differentiated). These Parking Heaters are used in a wide variety of commercial vehicles to keep the cabin or other compartment of the vehicle warm while the operator of the vehicle rests, thereby permitting that operator to sleep without forcing the vehicle to idle, which is economically wasteful, harmful to the environment and potentially dangerous for the operator. The term "aftermarket", as used in this Complaint, refers to the purchase of Parking Heaters for installation in a vehicle after it has been sold by the original vehicle manufacturer.

4.      Throughout the Class Period, Defendants and their unnamed co-conspirators conspired to, and did, fix prices on Parking Heaters. By acting together and in concert to fix prices, Defendants and their unnamed co-conspirators caused the price of Parking Heaters to be artificially high, reaping millions of dollars from unlawful overcharges. Defendants and their unnamed co-conspirators sold Parking Heaters to purchasers, including to Plaintiff, during the Class Period.

5.      A governmental investigation into anticompetitive conduct in the market for Parking Heaters is ongoing in the United States, with one conspirator – Defendant Espar Inc. – already pleading guilty. Espar Inc. has agreed to pay a $14.97 million criminal fine.

6.      The price-fixing conspiracy in which the Defendants and their unnamed co-conspirators engaged allowed Defendants and their unnamed co-conspirators to charge more for

Parking Heaters, including to Plaintiff, than they would have been able to absent the conspiracy. Accordingly, Plaintiff seeks relief for the damages it has suffered as a result of Defendants' violations of federal law. Plaintiff asserts claims under the Sherman Act, (15 U.S.C. §§ 1, *et seq.*) and the Clayton Act, (15 U.S.C. §§ 12, *et seq.*)

## JURISDICTION AND VENUE

7.      This action arises under Section 1 of the Sherman Act, 15 U.S.C., § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

8.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

9.      Venue is proper in this District pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d). Defendants resided, transacted business, were found, or had agents in the District, a substantial part of the events giving rise to Plaintiff's claims arose in the District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## THE PARTIES

### Plaintiff

10.      Plaintiff Myers Equipment Corporation is an Ohio corporation with its principal place of business in Canfield, Ohio. Plaintiff directly purchased Parking Heaters from Webasto Products North America, Inc. during the Class Period, paying more for the parking heaters than it would have absent the anticompetitive conduct of Defendants and their unnamed co-conspirators, and was injured as a result.

### Defendants

11.      Defendant Espar Inc. is an Illinois corporation headquartered at 29101 Haggerty Road Novi, MI 48377-2913. Espar Inc. has pled guilty for its role in the conspiracy alleged

herein. Espar Inc. executed the plea agreement cited above with the United States Department of Justice ("DOJ"), which was entered by Judge John Gleeson of the United States District Court for the Eastern District of New York on March 12, 2015.

12.     Defendant Espar Products Inc. ("EPI") is a Canadian company with its principal place of business located at  6099A Vipond Drive, Mississauga, Ontario L5T 2B2. Espar Products Inc. is an affiliate of Espar Inc.

13.     Both Defendants Espar Inc. and Espar Products Inc. are wholly-owned subsidiaries of J. Eberspächer GmbH & Co. and the Eberspächer Group ("Eberspächer"), a German company headquartered in Esslingen Germany. Eberspächer has agreed to guarantee the payment of the $14.97 million criminal fine by Espar Inc.

14.     Espar, directly and through some of their affiliate corporations, sold Parking Heaters in the United States for commercial use in the aftermarket during the Class Period.

15.     Webasto Products North America, Inc. is a Michigan corporation headquartered in Rochester Hills, Michigan. Webasto Products North America, Inc. sold Parking Heaters for commercial use in the aftermarket during the Class period.

16.     Defendant Webasto Thermo & Comfort North America, Inc. is headquartered in Fenton, Michigan, where it also operates a plant which manufactures parking heaters for commercial and other vehicles. Defendant Webasto Thermo & Comfort North America, Inc. is a wholly-owned subsidiary of Defendant Webasto Products North America, Inc. (collectively, "Webasto").

17.     Defendant Webasto Products North America, Inc. is a wholly-owned subsidiary of Webasto SE, a German company based in Stockdorf, Germany.

18.     Webasto has been identified as the applicant under the DOJ's corporate leniency

-4-

program in the criminal Parking Heater price-fixing case.

19. Webasto, directly and through some of their affiliate corporations, sold Parking

Heaters in the United States for commercial use in the aftermarket during the Class Period.

## UNNAMED CO-CONSPIRATORS

20. Various other entities and individuals not named as defendants in this Complaint

participated as co-conspirators in the acts complained of and performed acts and made

statements that aided and abetted and furthered the unlawful conduct alleged herein.

## CLASS ACTION ALLEGATIONS

21. Plaintiff brings this action as a class action under Rules 23(a) and 23(b)(3) of the

Federal Rules of Civil Procedure, on behalf of itself and all others similarly situated. The "Class"

is defined as:

> All persons or entities (other than Defendants and their employees,
> affiliates, parents, and subsidiaries) that purchased in the United
> States, directly from a Defendants or one of their co-conspirators,
> an air or coolant parking heater sold in the aftermarket for use in
> commercial vehicles, including the heaters themselves, accessories
> sold for use with heaters and packaged kits containing heaters and
> selected accessories ("Parking Heaters") at any time between
> October 1, 2007 and December 31, 2012 (the "Class Period").

22. The Class is so numerous that joinder of all members is impracticable. While the

exact number of Class members is unknown at this time, Plaintiff is informed and believes that at

least hundreds of geographically dispersed Class members purchased Parking Heaters directly

from Defendants or one of their co-conspirators during the Class Period.

23. Plaintiff's claims are typical of the claims of the other members of the Class.

Plaintiff and the members of the Class sustained damages arising out of the common course of

conduct of Defendants and their unnamed co-conspirators in violation of law as complained

herein. The injuries and damages of each member of the Class were directly caused by the

wrongful conduct of Defendants and their co-conspirators in violation of the antitrust laws as alleged herein.

24.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

25.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants and their co-conspirators engaged in a contract, combination and/or conspiracy to fix, raise, maintain and stabilize prices of Parking Heaters sold in the United States and/or for delivery into the United States;

(b)     the identity of the participants in the conspiracy;

(c)     the duration of the conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     whether the conspiracy violated the Sherman Act;

(e)     whether the conduct of Defendants and their co-conspirators caused injury to the businesses and property of the Plaintiff and the other members of the Class;

(f)     the effect of the conspiracy on the prices of Parking Heaters sold in the United States and/or for delivery into the United States during the Class Period; and

(g)     the appropriate measure of damages.

26.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens

upon the courts and the Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

27.     The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants. Plaintiff does not anticipate any difficulty in the management of this action as a class action.

## TRADE AND COMMERCE

28.     Throughout the Class Period, Defendants and their unnamed co-conspirators manufactured, sold and shipped substantial numbers of Parking Heaters in a continuous and uninterrupted flow of interstate commerce throughout the United States, including in this District.

29.     The unlawful activities of Defendants and their unnamed co-conspirators that are the subject of this Complaint were within the flow of, and have a direct and substantial effect on, interstate trade and commerce.

## FACTUAL ALLEGATIONS

## I.     FACTUAL BACKGROUND ON PARKING HEATERS

30.     Operators of commercial vehicles, such as large commercial trucks, must often remain idle in their vehicle for rest breaks and other purposes, and need a way to stay warm. For many such drivers, idling the vehicle itself may be the only way to provide heat to the cabin of

the vehicle. Such idling, however, is inefficient and runs afoul of anti-idling laws.

31.     In fact, idling tailpipes "spew out the same pollutants that form unhealthy smog and soot as those from moving cars," contribute to global warming through the release of carbon dioxide ($CO_2$), and waste a tremendous amount of fuel.[1] For example, an idling diesel truck burns approximately one gallon of fuel per hour.[2] According to a 2011 estimate, 30 percent of a truck's idling time is devoted to keeping the cabin warm.[3] In addition, idling poses health risks to vehicle operators,[4] risks that are greatly increased for operators who spend their working lives driving vehicles.

32.     Parking Heaters offer a solution to this problem, providing heat without the need to idle. Indeed, the Environmental Protection Agency itself has recommended Parking Heaters as one way to mitigate idling's impact:

> Install a small generator or auxiliary power unit specifically designed for a truck that provides heat, air conditioning, and/or electrical power while the vehicle is not in motion. These devices are a better, more efficient alternative to idling as they use substantially less fuel and emit less pollution. Depending on the amount of time spent idling each year, the payback on these devices can be one to two years.[5]

33.     This is consistent with President Obama's goal of reducing big rig fuel consumption by 23%.

---

[1] "Attention drivers! Turn off your idling engines," Environmental Defense Fund, available at http://www.edf.org/transportation/reports/idling.

[2] *Id.*; "What You Should Know About Truck Engine Idling," Environmental Protection Agency, New England (April 2002), available at http://www.epa.gov/region1/eco/diesel/pdfs/Diesel_Factsheet_Truck_Idling.pdf.

[3] Marek Krasusi, *Evolving Technologies Dominate Industry*, Western Trucking News (Dec. 2011).

[4] What You Should Know About Truck Engine Idling," Environmental Protection Agency, New England (April 2002), available at http://www.epa.gov/region1/eco/diesel/pdfs/Diesel_Factsheet_Truck_Idling.pdf.

[5] *Id.*

34.    At least 19 states have enacted anti-idling legislation in the last few years,[6] with states such as California and Hawaii allowing effectively no idling at all. Several municipalities, such as New York City and Philadelphia, also have anti-idling regulations in place.[7]

35.    The Environmental Protection Agency also has a Clean School Bus Campaign, which encourages the use of systems such as Parking Heaters to reduce the amount of idling necessary for school buses.[8] As the bus fleet manager of the Denver public schools has said in support of using Parking Heaters on school buses, "Any time you can reduce engine idle and maintain temperature, it's a win for the driver, students and vehicle."[9]

36.    Defendants manufacture and sell two primary types of Parking Heaters: (a) air heaters, which work by heating interior or outside air drawn into the heater unit; and (b) water or "coolant" heaters, which are integrated into the engine coolant circuit and heat the engine as well as the interior compartment.

37.    Coolant heaters, such as Espar's Hydronic Heating systems, are largely intended to heat engine parts. In these systems, fuel and air are combined, which generates heat in the combustion chamber. The heater's water-pump then warms up, which causes engine coolant to circulate throughout the vehicle's engine's cooling system to transfer heat to the engine. Heating of the cabin is a supplementary effect of this type of system.[10] These fuel-operated coolant systems are small, weighing approximately six to seven pounds.[11]

---

[6] Anti-Idling Laws Around the Nation," Sustainable Blog (April 19, 2013), available at http://www.sustainableamerica.org/blog/anti-idling-laws-around-the-nation/

[7] *Id.*

[8] http://www.epa.gov/cleandiesel/sector-programs/antiidling.htm.

[9] "The Hot Topic of Heating," School Transportation News (Sept. 2006), available at http://studiostn.com/stn/articlearchive/heating_0906.htm.

[10] Trucking Efficiency, Confidence Report: Idle-Reduction Solutions (2014), at 35.

[11] *Id.*

38.     Air Parking Heaters such as Espar's Airtronic Heater act like small furnaces. They have a heating element and a blower to provide heat either through a direct duct or through a vehicle's factory-installed HVAC ducting. Like the coolant-based systems, these Parking Heaters are small, weighing between six to eight pounds and are approximately the size of a loaf of bread.[12]

39.     In contrast to the large amount of fuel used when an engine is idling, fuel-operated air Parking Heaters such as Espar's Airtronic Heaters, sometimes called bunk heaters, typically use as little as .02 to .13 gallons of fuel an hour, with the average fuel-operated air Parking Heater burning no more than a gallon of fuel every 24 hours.[13]

40.     As air Parking Heaters, Airtronic Heaters require minimal fuel and power to operate. Espar advertises it Airtronic Parking Heaters as "simple, efficient and convenient!" As it explains, Airtronic Parking Heaters can save "over 1,000 gallons of fuel per year by reducing idle time."[14] Unlike coolant heating systems, which are integrated directly into a vehicle's coolant circuit, Airtronic Parking Heaters and other air Parking Heaters work independent of the vehicle's existing heating and cooling system, allowing them to warm the compartment quickly.[15]

41.     Below is a basic diagram of a fuel-based air Parking Heater (specifically, Espar's Airtronic Parking Heater)[16]:

---

[12] *Id.*, at 34.

[13] *Id.*

[14] Espar AIRTRONIC D2/D4/D5 Spec. Sheet.

[15] "Espar Climate Control Systems, Auxiliary Heaters for All Markets," at 3, available at: http://www.espar.com/fileadmin/data/countrysites/EB_Kanada/pdf/All_Market_Brochure_WEB_READY_021014_.pdf

[16] Espar Brochure on AIRTRONIC Air Heaters.



42.     Air Parking Heaters such as Espar's Airtronic Heaters are typically mounted under or behind the outside of a sleeper cab, and connect a fuel pump directly to the vehicle's fuel tank, using the vehicle's main batteries as a source for the electric power needed to run the Parking Heater.[17] The cab is also equipped with a driver-controlled panel with an on/off switch and temperature and fan settings.

43.     Below is a diagram providing an example of an installed fuel-operated Parking Heater in the cab area of a semi-trailer truck from the Espar installation for an Airtronic Heater manual:

---

[17] Trucking Efficiency, Confidence Report: Idle-Reduction Solutions (2014), at 34.



44.     Air Parking Heaters range in price from $800 to $1500, depending on the type of heater and require minimal maintenance.[18]

45.     The main goal of each of these types of units is to provide a cheaper and more efficient means of keeping the operator's cabin warm without the waste of idling the vehicle. Espar Inc.'s Airtronic line of air Parking Heaters, for example, is designed "for cab and sleeper heat in trucks, workshop vehicles, freight compartments and interior heat in general" – all without idling the vehicle's engine.[19]

46.     Espar is one of the largest suppliers of Parking Heaters in North America, with over $62 million in commerce in Parking Heaters in the United States during the Class Period.

47.     The conspiracy alleged herein only involves fuel-operated Parking Heaters used in commercial vehicles, as reflected in the aforementioned plea agreement. Both coolant Parking Heaters such as Espar's Hydronic Coolant Parking Heaters, and air Parking Heaters, such as Espar's Airtronic air Parking Heaters, were subject to the conspiracy, which also encompassed Parking Heater accessories and Parking Heater kits, in which both the Parking Heater and the

---

[18] *Id.*, at 35-36.

[19] Espar AIRTRONIC D2/D4/D5 Spec. Sheet, available at:
www.espar.com/fileadmin/data/countrysites/EB_Kanada/pdf/Airtronic_D2-D4-D5_Spec_sheet.pdf.

accessories were sold together.

## II.   DEFENDANTS AND THEIR CO-CONSPIRATORS AGREED TO FIX PRICES FOR PARKING HEATERS

48.    Defendants and their co-conspirators had clandestine meetings and discussions, at which they agreed to fix, raise or maintain prices for Parking Heaters.

49.    The conspiracy consisted of a continuing agreement, understanding, and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, stabilize and maintain prices of parking heaters for commercial vehicles sold to aftermarket customers in the United States, as well as elsewhere in North America.

50.    As part of the conspiracy, Defendants and their co-conspirators discussed prices for Parking Heaters sold for use in commercial vehicles on the aftermarket, agreed to set a price floor for Parking Heater kits, and agreed to coordinate the timing and amount of price increases.

51.    Defendants and their co-conspirators also agreed to exchange, and did exchange, information in order to monitor and enforce adherence to the agreement.

## III.   THE STRUCTURE OF THE PARKING HEATER INDUSTRY IS CONDUCIVE TO COLLUSION

52.    Parking Heaters are sold by manufacturers through distributors, dealers and to original equipment manufacturers. In addition to other methods, Espar engages in contracts with master service dealers, with assigned market territories, to which it sells fuel-operated Parking Heaters, and that are authorized to sell, install and repair its heaters.

53.    "As it stands, only a select few manufacturers continue to control the lion's share of the heating system industry."[20] The three companies that dominate the market are Espar,

---

[20] Marek Krasusi, *Evolving Technologies Dominate Industry*, Western Trucking News (Dec. 2011).

Webasto, and Proheat, collectively accounting for the lion's share of the market.[21]

54.     Webasto Product North America, Inc. is headquartered in Rochester Hills, Michigan, and its affiliate, Webasto Thermo & Comfort North America, Inc., which manufactures parking heaters for commercial and other vehicles, is headquartered in Fenton, Michigan, where it also operates a manufacturing plant. Webasto Thermo & Comfort SE of Gilching, Germany owns both Webasto Product North America, Inc. and Webasto Thermo & Comfort North America, Inc. (collectively, "Webasto"). Webasto manufactures the Air Top 2000 ST and the Air Top Evo 40/55 air Parking Heaters for commercial vehicles and heavy machinery. Webasto also manufactures four types of coolant Parking Heaters. Webasto promotes itself as the "world market leader" for interior cab and coolant heaters.[22] Its heating and cooling systems division accounts for 20% of its more than €2.5 billion sales volume.[23] North America is one of its top markets.

55.     Marine Canada Acquisition Inc. ("Proheat") is based in British Columbia, Canada and manufactures air auxiliary heaters for heavy-duty vehicles, including the Proheat Air Parking Heater, along with a Proheat X45 coolant heater, available in both 2 and 4 kilowatt models, capable of heating both the engine block and the truck cab.

56.     The global market for fuel-operated Parking Heaters is highly concentrated, with Webasto alone accounting for 75% of the global Parking Heater market.

57.     Defendants manufacture and sell Parking Heaters that are interchangeable and in competition with Parking Heaters offered by other manufacturers. All Parking Heaters serve the

---

[21] Marek Krasusi, *Evolving Technologies Dominate Industry*, Western Trucking News (Dec. 2011); Trucking Efficiency, Confidence Report: Idle-Reduction Solutions (2014), at 34-35.

[22] http://www.webasto.com/us/markets-products/truck/heating-systems/.

[23] http://www.webasto.com/us/markets-products/truck/heating-systems/.

same purpose for consumers; they serve as an alternative to engine idling to provide heat to a compartment and/or to vehicle equipment. As such, Parking Heater purchasers are likely to be influenced by price when making a decision regarding which Parking Heater to purchase. In this regard, Parking Heaters act as commodity-like products.

58.     Espar and Webasto manufacture the two leading fuel-operated heaters on the market: Espar's Airtronic D2 and Webasto's Air Top 2000; both expend only one gallon of fuel over 20+ hours of operation, come with a built-in thermostat and operate in a similar manner, drawing air and fuel into a heat exchanger.[24]

59.     In addition to aftermarket sales, Webasto and Espar are also the key suppliers to original equipment manufacturers. Parking Heaters are available as factory-installed options and every major truck manufacturer offers optional fuel-operated heaters of either Webasto or Espar, or both.[25]

60.     Parking Heaters have few substitutes. Alternative technologies for heating truck cabs, such as auxiliary power units ("APUs") or generator set systems ("gen-sets"), which incorporate an HVAC system, cost three to eight times as much as Parking Heaters.[26] For example, a gen-set can cost upwards of $8,000 or more compared to fuel-operated Parking Heaters' price tag of often less than $1,500 or less. APUs and gen-sets are more complex to install, add significant weight to the truck cab and require more maintenance.[27] Fuel powered heating systems, however, can be installed in a few hours by drilling a few holes and running

---

[24] Overdrive staff, *Cold Remedy*, Overdriveonline.com (Dec. 12, 2008), http://www.overdriveonline.com/cold-remedy/.

[25] Trucking Efficiency, Confidence Report: Idle-Reduction Solutions (2014), at 69.

[26] *Id.*

[27] *Id.*

fuel lines.[28] In addition, battery powered APUs have a limited runtime of about 10 hours.[29] As such, Parking Heaters constitute a distinct product market.

61.     There are also high barriers to entry to the Parking Heater industry in the form of technical know-how, including the manufacturing expertise required to make efficient, safe Parking Heaters and access to distribution channels. Moreover, Espar's "Master Service Dealers" are not permitted to manufacture, distribute or promote competing products within their designated territories, foreclosing potential entrants' access to key distribution channels.[30]

62.     Defendants had the opportunity to collaborate with competitors through their participation at industry trade shows. By way of example, Espar and Webasto both attended the NTEA World Truck Trade Show, held March 4 -7, 2014 in Indianapolis, Indiana.

63.     Espar and Webasto also attended the TMC Annual Meeting & Transportation Technology Exhibition held March 10-13, 2014 in Nashville, Tennessee, as promoted by the American Trucking Association, as well as Truck-World-Canada's National Truck Show held April 10-12, 2014 in Toronto, Canada.

64.     These trade shows provided Defendants ample opportunity to conspire with other Parking Heater industry participants.

65.     The commodity-like nature of Parking Heaters, along with the high barriers to enter the industry and the fact that the market is highly concentrated, make the Parking Heater market susceptible to anticompetitive conduct and make the conspiracy alleged herein plausible,

---

[28] *Id.*

[29] Denise Koeth, *Auxiliary Power Unit Update*, fleetequipmentmag.com (Sept. 2012), available at, http://www.fleetequipmentmag.com/auxiliary-power-unit-update.

[30] Espar MSD Program & Policy Manual (July 30, 2010), available at http://www.espar.com/fileadmin/data/countrysites/EB_Kanada/pdf/QSF-146_Rev_2_Espar_MSD_Contract_2010_2011.pdf.

particularly in light of the opportunities Defendants and their unnamed co-conspirators had to conspire at the various trade show meetings they each attended.

## IV.   GOVERNMENT INVESTIGATIONS OF THE PARKING HEATER INDUSTRY AND DEFENDANTS

66.   At least since January 26, 2015, the United States, through the New York office of the Antitrust Division of the Department of Justice, has been investigating unlawful and anticompetitive conduct in the Parking Heater industry.

67.   As a result of the investigation, a criminal case has been brought against Espar, which was assigned to the Honorable John Gleeson of the Eastern District of New York.

68.   On March 12, 2015, Defendant Espar Inc. pled guilty to violating one count of the Sherman Act for its participation in the conspiracy alleged herein. According to the charge, from October 1, 2007 through December 31, 2012, Defendant Espar Inc. and its co-conspirators discussed Parking Heater prices for commercial vehicles, agreed to set a price floor for Parking Heater kits (which include accessories used when a Parking Heater is installed) sold for use in commercial vehicles on the aftermarket and agreed to coordinate the timing and amount of price increases.[31] The conspirators also agreed to exchange, and did exchange, information in order to monitor and enforce adherence to the agreement.[32]

69.   As the criminal Information that accompanied Defendant Espar Inc.'s plea makes clear:

> During the [Class Period], for the purpose of forming and carrying out the charged conspiracy, the defendant [Espar Inc.] and its co-conspirators knowingly did those things that they combined and conspired to do, including, among other things:

---

[31] DOJ Press Release, "Parking Heater Company Pleads Guilty in Price-Fixing Scheme" (Mar. 12, 2015), available at http://www.justice.gov/atr/public/press_releases/2015/312477.htm
[32] *Id.*

(a) participating in communications, discussions, and meetings in the United States and elsewhere to discuss aftermarket prices for [Parking Heaters] for commercial vehicles;

(b) agreeing, during those conversations and meetings, to set a price floor for [Parking Heater] kits for commercial vehicles sold to aftermarket customers in the United States and elsewhere in North America;

(c) agreeing, during those conversations and meetings, to coordinate the timing and amount of price increases for [Parking Heaters] for commercial vehicles sold to aftermarket customers in the United States and elsewhere in North America;

(d) exchanging information during those conversations and meetings for the purpose of monitoring and enforcing adherence to the agreements described in subparagraphs (b) and (c) above; and

(e) selling [Parking Heaters] for commercial vehicles to aftermarket customers at collusive and non-competitive prices in the United States and elsewhere in North America.[33]

70.     The Plea Agreement, which was approved by Espar's Board of Directors and

Espar's counsel, states that Espar Inc.:

through its directors, officers, and employees, including high level personnel of the defendant [Espar], participated in a combination and conspiracy to suppress and eliminate competition by agreeing to fix, stabilize, and maintain prices [of] parking heaters for commercial vehicles sold to aftermarket customers in the United States and elsewhere in North America, from at least as early as October 1, 2007 through at least December 31, 2012. In furtherance of the conspiracy, the defendant [Espar], through its directors, officers, and employees, engaged in communications and discussions and attended meetings with representatives of its co-conspirators. During these communications, discussions, and meetings, agreements were reached to fix, stabilize, and maintain prices on parking heaters to be sold to aftermarket customers in the United States and elsewhere in North America.

71.     Attachment A to the plea agreement contains the names of individuals "who have

not received protection under the plea agreement but who have not been indicted.[34]

---

[33] "Information" (March 12, 2015) filed in *Espar*.

[34] Letter to Judge Gleeson from Carrie Syme of the Department of Justice, on behalf of the Department of Justice and counsel for Espar, filed in *Espar*, 15-cr-0028.

72.     Espar Inc. agreed to pay a criminal fine of $14,970,000. Eberspächer, the German parent company of Espar Inc. has agreed to guarantee the payment of the criminal fine by Espar Inc. No requirement to pay restitution to those harmed by Espar Inc.'s conduct is contained within the plea.

73.     Following Defendant Espar Inc.'s plea agreement, the DOJ issued a press release stating that, "Today's plea demonstrates the [DOJ's] Antitrust Division's commitment to holding companies accountable for conspiracies that fix prices on parts used in every day products."[35] Assistant Attorney General Bill Baer, who leads the Antitrust Division of the DOJ, also stated that "The Antitrust Division will vigorously prosecute companies that engage in schemes that subvert normal competitive processes and defraud American consumers and businesses."[36]

74.     Espar confirmed that it entered into a plea agreement for collusion related to Parking Heaters, with Espar's vice president of marketing and communication, John Dennehy, verifying the Department of Justice investigation into Espar's anticompetitive activity and stating that Espar "has cooperated fully with the US Department of Justice throughout this investigation."[37]

75.     In addition, a fleet manager at a trucking company who was affected by the conspiracy also confirmed that he had received paperwork notifying him of the case against

---

[35] DOJ Press Release, "Parking Heater Company Pleads Guilty in Price-Fixing Scheme" (Mar. 12, 2015), available at http://www.justice.gov/atr/public/press_releases/2015/312477.htm.
[36] Id.

[37] "Company colluding on parking heaters will plead guilty in US," Global Competition Review (February 26, 2015), available at
http://globalcompetitionreview.com/news/article/38078/company-colluding-parking-heaters-will-plead-guilty-
us/?utm_source=Law+Business+Research&utm_medium=email&utm_campaign=5402514_GCR+Headlines&dm_i=1KSF,37SLU,9GQ5EU,BIN9N,1.

Espar.[38]

76.     The DOJ has confirmed that its investigation into a conspiracy to fix prices for

Parking Heaters is ongoing.[39] As part of its plea agreement, Defendant Espar Inc. has agreed to

cooperate with the DOJ in its ongoing investigation into the conspiracy alleged herein. This

cooperation includes cooperation from both Espar Defendants, as well as their German parent

Eberspächer. Pursuant to this cooperation, Espar will provide documents to the DOJ and secure

cooperation from officers, directors and employees, including through interviews and testifying

before a grand jury if so called.

77.     Webasto has been identified as the applicant under the DOJ's corporate leniency

program in the criminal Parking Heater price-fixing case.

78.     The European Commission recently found that Eberspächer and Webasto SE

engaged in a conspiracy to fix the prices for parking heaters in the European Union. The

European Commission's investigation "showed that over a period of 10 years, from September

2001 until September 2011, Webasto and Eberspächer coordinated prices and allocated

customers in the entire European Economic Area (EEA). When the companies received requests

for price quotations from car or truck manufacturers, they discussed various price elements,

agreed which of the two would submit the winning lower bid, and exchanged other commercially

sensitive information."[40]  The European Commission imposed a fine of over 68 million Euros on

Eberspächer. This fine was reduced under the European Commission's leniency program to

reflect Eberspächer's cooperation with the investigation. Webasto SE was not fined because it

---

[38] *Id.*

[39] DOJ Press Release, "Parking Heater Company Pleads Guilty in Price-Fixing Scheme" (Mar. 12, 2015), available at http://www.justice.gov/atr/public/press_releases/2015/312477.htm.

[40] http://europa.eu/rapid/press-release_IP-15-5214_en.htm

benefited from immunity for revealing the existence of the cartel to the European Commission.

## FRAUDULENT CONCEALMENT AND THE TOLLING OF
## THE STATUTE OF LIMITATIONS

79.     Plaintiff did not discover and could not have discovered through the exercise of reasonable diligence that it was injured by the conspiracy to fix prices for Parking Heaters until after March 12, 2015 when the DOJ's criminal investigation of Parking Heater price-fixing and Espar Inc.'s guilty plea were publically announced.

80.     Before the government investigations into the alleged misconduct was revealed on March 12, 2015, Plaintiff could not have stated facts plausibly suggesting a concerted and conspiratorial effort to conspire to fix prices for Parking Heaters.

81.     The unlawful activity of Defendants and their co-conspirators to fix prices for Parking Heaters was inherently self-concealing. By its very nature, the alleged misconduct of Defendants and their co-conspirators was self-concealing. The internal communications between Defendants and their co-conspirators were not public information, rendering impossible any ascertainment of the specific misconduct of Defendants and their co-conspirators.

82.     As a result of the self-concealing nature of the collusive scheme of Defendants and their co-conspirators, no person of ordinary intelligence would previously have discovered their conspiracy to fix prices for Parking Heaters to the detriment of Plaintiff and the Class.

83.     In addition, Espar made affirmative representations during the Class Period that it priced competitively, stating in 2010, for example, that "Espar provides uncompromised quality at competitive pricing."[41]

84.     Plaintiff had no knowledge of the unlawful conduct alleged in this Complaint, or

---

[41] "Espar Can Help: Product Options to Positively Impact Our Environment" (2010), available at http://www.granitestatecleancities.nh.gov/calendar/2011/documents/espar_heaters.pdf.

of any facts that could or would have led to the discovery thereof, until after March 12, 2015.

85.     Because Defendants and their co-conspirators employed acts and techniques that were calculated to wrongfully conceal the existence of such unlawful activity conduct, including through clandestine meetings at which information was exchanged, Plaintiff could not have discovered the existence of this unlawful conduct any earlier than February 11, 2015. Because of Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class has been tolled during the period of such fraudulent concealment.

## DEFENDANTS' ANTITRUST VIOLATIONS

86.     During the Class Period, as explained above, Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1). Upon information and belief, these activities included agreeing to fix, increase, stabilize and/or maintain prices of Parking Heaters sold in the United States.

87.     The conspiracy alleged herein has had the following effects, among others:

    (a) price competition in the sale of Parking Heaters by Defendants and their unnamed co-conspirators has been restrained, suppressed and eliminated throughout the United States;

    (b) prices charged to Plaintiff and the other members of the Class for Parking Heaters have been raised, fixed, maintained and stabilized at artificially high and non-competitive levels; and

    (c) Plaintiff and the other members of the Class have been deprived of the benefits of free and open competition in the purchase of Parking Heaters.

88.     As a direct and proximate result of the unlawful conduct of Defendants and their unnamed co-conspirators, Plaintiff and the Class have been injured in their business and property in that they paid more for Parking Heaters than they otherwise would have paid in the absence of the unlawful conduct of Defendants and their unnamed co-conspirators.

## CLAIM FOR RELIEF
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT
## (15 U.S.C. § 1)

89.     Plaintiff incorporates by reference the preceding allegations.

90.     Defendants and their co-conspirators entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

91.     The contract, combination or conspiracy has resulted in an agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants and their co-conspirators raised, fixed, stabilized and maintained prices for Parking Heaters. Such contract, combination or conspiracy constitutes a *per se* violation of the federal antitrust laws.

92.     Defendants and their co-conspirators' contract, combination, agreement or conspiracy occurred in or affected interstate and international commerce. Defendants and their co-conspirators' unlawful conduct was through mutual understanding or agreement between or among Defendants and their co-conspirators. These other co-conspirators either have acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

93.     The unlawful contract, combination or conspiracy of Defendants and their co-conspirators has had at least the following effects:

-23-

(a) prices charged by Defendants and their co-conspirators to Plaintiff and the members of the Class for Parking Heaters were fixed, raised, stabilized and maintained at artificially high and non-competitive levels in the United States;

(b) Plaintiff and the other members of the Class had to pay more for Parking Heaters than they would have paid in a competitive marketplace, unfettered by Defendants and their co-conspirators' collusive and unlawful activities;

(c) price competition in the sale of Parking Heaters was restrained, suppressed and eliminated in the United States; and

(d) as a direct and proximate result of the unlawful combination, contract or conspiracy, Plaintiff and the members of the Class have been injured and financially damaged in their businesses and property, in amounts to be determined.

94.     Plaintiff and members of the Class are each entitled to treble damages for the violations of the Sherman Act alleged herein.

## RELIEF SOUGHT

WHEREFORE, Plaintiff prays for relief as follows:

A.     That the Court determine that this action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, that Plaintiff Myers Equipment Corporation be appointed as class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

B.     That the unlawful conduct alleged herein be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act;

C.     That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees, as well as all other persons acting or claiming to act on its behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

D.     That Plaintiff and the Class recover damages, as provided under federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount to be trebled in accordance with such laws;

E.     That Plaintiff and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

That the Court direct such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff Myers Equipment Corporation demands a jury trial as to all issues triable by a jury.

Dated: July 1, 2015                          Respectfully submitted,

/s/ _____

Allan Steyer
D. Scott Macrae
STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP
One California Street, Third Floor
San Francisco, CA 94111
(415) 421-3400
(415) 421-2234 (fax)
asteyer@steyerlaw.com
smacrae@steyerlaw.com

*Counsel for Plaintiff*

-25-